NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

                                :

**STEPHEN A. FOLSOM**          :

                                :        Civil Action No.  06-cv-1651(PGS)

              Plaintiff,    :

                                :

              v.                :

                                :

**SUPERIOR COURT OF NEW JERSEY,**   :
**MIDDLESEX VICINAGE**        :

                                :         **OPINION**

              Defendant.    :

_____:

## SHERIDAN,  U.S.D.J.

_____Pro se Plaintiff was a former probation officer employed by Defendant.  His employment was terminated, allegedly based upon poor performance and failure to improve his writing skills. Plaintiff alleges that the firing was discriminatory because he is African-American, and further claims that he was subjected to a hostile work environment and racial harassment in violation of Title VII.  Defendant moved for summary judgment as to both of Plaintiff's Title VII claims, and Plaintiff has opposed the motion in three different submissions to the Court – a pre-emptive opposition (filed before the summary judgment motion), an opposition brief, and a supplemental opposition brief.  This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964 and 28 U.S.C. § 1331.  For the reasons set forth below, Defendant's motion for summary judgment will be granted.

I.

      Plaintiff pro se Stephen Folsom ("Plaintiff" or "Folsom") is an African-American man formerly employed by the Superior Court of New Jersey, Middlesex Vicinage ("Defendant"), as a probation officer in the Criminal Case Management Unit ("CCMU").  Folsom began his employment with Defendant in late December, 2004, and pursuant to N.J. Code Ann. § 4A:1-1.3, was placed on a four-month working test period (as a probationary employee).  Employment as a probation officer in the CCMU is writing-intensive, as employees must learn how to assemble Pre-trial Intervention Reports ("PTI") and Pre-sentence Investigation Reports ("PSI").  To that end, Plaintiff received extensive training, including a new employee training seminar and orientation, and observations of pre-arraignment conferences, post-plea interviews, inmate interviews, and bail investigation proceedings.  Plaintiff was supervised by Team Leader Donald L. Mertz ("Mertz") and was assigned to Master Probation Officer Doris Woscyna ("Woscyna") in order to learn how to properly write these reports.

        Folsom received four performance reviews while in the employ of Defendant.  The first report came after 60 days of employment ("the 60-day report"), on February 23, 2005 (Jones Cert. Ex. 4).  This evaluation rated Plaintiff's work as "satisfactory," but noted that Plaintiff was having trouble with the writing requirements – in particular, combining facts and making assessments and final sentencing recommendations.  Plaintiff received his second performance review on April 20, 2005 ("the 120-day report") (Jones Cert. Ex. 5).  The 120-day report indicated that Plaintiff's performance was "unsatisfactory" because Plaintiff continued to have the same writing difficulties (combining facts and making final assessments and recommendations).  Based on Woscyna's reports, Mertz concluded that Folsom was having "great difficulty in most parts of the PSI format."

"[E]xtensive corrections" were suggested, but Folsom either failed to make the changes, made incorrect changes or deletions, or contradicted himself in various areas of the reports (Jones Cert. Ex. 5). Other probation officers and master probation officers observed the same problems while training Folsom when Woscyna was on vacation. Given Folsom's unsatisfactory performance, Mertz recommended extending the working test period in order to allow Folsom to improve his writing skills. Plaintiff acknowledged that he understood he had to improve his writing skills, and that the working test period was extended from April 20, 2005 to June 27, 2005.

On May 26, 2005, Folsom received his third performance evaluation ("the 150-day report") (Jones Cert. Ex. 8). The 150-day report indicated, once again, that Plaintiff's performance was unsatisfactory, and again suggested that the working test period should be extended. The 150-day report highlighted the same problems noted in the previous reports and concerned his poor writing skills despite extensive help. More specifically, Plaintiff could not combine facts, placed erroneous information in the reports, made mistakes in the listing of prior offenses, and was still unable to conclude his reports with a sentencing recommendations that was based on the facts. The 150-day report noted that other supervisors noticed the same continuing problems despite an additional four-day writing course.[1] Moreover, this evaluation charted the timeliness of Plaintiff's PSI and PTI Reports, indicating that many were submitted late – thus requiring adjournments of sentencings – and some were never submitted at all. On May 27, 2005, Plaintiff met with Assistant Criminal

---

[1] Along with the extra training, the 150-day report indicated that Plaintiff had received fewer assignments so that he could more easily meet the required deadlines. Folsom, however, in his letter to the EEOC in support of his discrimination charge, indicated that he was assigned cases "which appeared too intricate for a new employee with little or no prior training in the casework under such time constraints" and that his colleagues "made every effort to confuse me because of my new status."

Division Manager Vicki D. DiCaro ("DiCaro") and Mertz to discuss the goal of improving his writing skills and how best to revise his report writing schedule.

On June 17, 2005, Plaintiff received his final progress report ("the notice of termination") (Jones Cert. Ex. 9). The notice of termination indicated that Plaintiff had still failed to improve his performance, rated his work as "unsatisfactory," and concluded that despite extensive training, Folsom's lack of improvement meant that Mertz could not recommend him for permanent employment. On June 23, 2005, Plaintiff received an official notification of termination effective June 27, 2005, for failure to satisfactorily complete his extended working test period. Plaintiff admitted in his deposition that his termination was due to poor performance evaluations (Jones Cert. Ex. 2 at 51:11-16). Pursuant to N.J. Stat. Ann. § 4A:2-4.2, Folsom appealed his termination to the New Jersey Department of Personnel, Merit System Board, which transferred the matter to the Office of Administrative Law to conduct an evidentiary hearing and recommend a course of action. Thereafter a settlement conference was scheduled for October 4, 2005, but Plaintiff failed to appear and the matter was deemed abandoned and was dismissed.[2] Folsom then requested that the Merit System Board reinstate his appeal, but his request was denied. On February 28, 2006, Plaintiff filed a discrimination charge with the New Jersey Division of Civil Rights alleging race discrimination. On March 17, 2006, the United States Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights Letter indicating that its investigation into Folsom's race discrimination claim yielded no evidence that could establish any type of statutory violation. On

---

[2]  Plaintiff claims that his failure to appear resulted from lack of advance notice of the settlement conference date and that he had moved away from New Jersey at the time the notice was sent. Folsom submitted no external evidence to prove that he was living in Florida at the time of the notice and the hearing.

April 7, 2006, Folsom filed his complaint in this matter.

Plaintiff attempts to pinpoint the factual bases for his Title VII hostile work environment and unlawful termination claims in various documents submitted to the Court, including documents attached to his complaint, a pre-emptive opposition brief filed before Defendant's summary judgment motion, his actual opposition brief, and a supplemental opposition brief.

In a letter to the ACLU (attached to the complaint), Folsom indicates that he was "verbally harassed daily by . . . Mertz" and that union representative Ann Rizzi ("Rizzi") and the union shop steward did nothing to prevent it.  Plaintiff does not specify the nature of the alleged harassment. Furthermore, in his "Rebuttal to termination Decision" letter (also attached to the complaint), Folsom indicates that Mertz yelled at him, took out alleged personal frustrations on him, singled him out for scolding as opposed to other employees, and mentally abused him.  Folsom also alleges that he was "being harassed on the job daily" for months, that Mertz would "sneer" as he edited Folsom's work, and that his conversations with Mertz were "so intense that employees of CCM had to stop what they were doing and listen to what was being said."[3]  Furthermore, Folsom alleged that the harassment prevented him from doing his work (which is why he received poor evaluations) and that he experienced computer problems that Defendant refused to address.

In Plaintiff's pre-emptive opposition to Defendant's summary judgment motion, Folsom alleges that he "suffered intentional discrimination because of race and that it was pervasive and regular.  Plaintiff further adds that his supervisor criticized his work in a sarcastic manner in front of other colleagues, submitted negative comments in the personnel file, and apparently influenced

---

[3]  Interestingly, at least two of Folsom's reviews (the 60-day report, indicating satisfactory work, and the 120-day report, indicating unsatisfactory work) indicate that "Mr. Folsom has related well with his co-workers and with supervisors." (Jones Cert. Exs. 4 and 5).

other employees to cease normal conversation with plaintiff." Folsom also alleges that he "was set up to fail as a result of the mob like actions of the defendants" and that he received inadequate mentoring and training. Defendant also allegedly gave Plaintiff an "in-depth number of cases" unlike any other employee. Folsom contended that "while the harassment was happening . . . no one did anything to rectify the situation" including the union shop steward and Rizzi.

Plaintiff's opposition brief indicates that "regular discriminatory acts of verbal humiliation (yelling and sneering) was committed on a daily basis." Plaintiff claims that he performed the job functions but was hindered by Mertz because Mertz's notes were illegible, his thoughts were incomplete, and his directions were unclear. Plaintiff's supplemental memorandum opposing Defendant's summary judgment motion accuses Mertz of "yelling . . . causing un-welcomed stress upon plaintiff," ignoring plaintiff, and not going over job expectations for over a month after Plaintiff started. Folsom also alleges that Mertz "had it in" for him because another probation officer told Folsom that Mertz hated him. At oral argument, Plaintiff noted that he was supervised by multiple superiors when Woscyna was on vacation, and that Mertz knew that this type of supervision was confusing, and it was purposely done so that Plaintiff would fail. Plaintiff states in a conclusory manner that his discharge based on unsatisfactory work performance was pretext for racial discrimination.

According to Defendant's Rule 56.1 statement and Jones Certification Exhibit 7, on May 25, 2005, Plaintiff met with Lawrence Bethea ("Bethea"), the Equal Employment Opportunity/Affirmative Action ("EEOAA") Officer for the Vicinage to discuss the issues he had with Mertz. Plaintiff met with Bethea after speaking with union representative Rizzi about problems he was having with Mertz; she suggested he speak with his union shop steward or with the EEOAA

6

representative.[4]  During the meeting with Bethea, Folsom indicated that he had gotten into a verbal

argument with Mertz based on one of Folsom's reports.  Folsom expressed concern that Mertz had

"a personal issue with him" based on the argument.  Bethea reviewed with Folsom the Judiciary's

Anti-Discrimination Policy and the categories protected thereunder, but Folsom did not file any

written EEOAA complaint – instead, he indicated that he would speak to Defendant's management

about his interactions with Mertz.[5]  Thereafter, DiCaro visited with Folsom to see how he was doing.

During each of these visits, Folsom told DiCaro that everything was fine and he did not mention his

alleged encounters with Mertz. Plaintiff's opposition brief, however, alleges that "plaintiff had

complained of discrimination to the union representative, shop steward, and the EEOC

representative" who talked him out of writing a formal complaint.[6]  Plaintiff also claims that the shop

steward did nothing to help him and that the union representative was present during all bouts of

discrimination and harassment.  Folsom further argues that he "was the only African-American Male

Probation Officer in the Division and it was shown that the co-workers did not want him to work

there" but that he "had not discussed the harassment with any other person(s) other that his

_____

[4]  Plaintiff did not file a grievance with the union regarding any issues at work or with
Mertz.

[5]  The record indicates that Folsom told Bethea that he had not previously raised these
issues with anyone working for Defendant and that his problems with Mertz were "personal" in
nature (Jones Cert. Ex. 7).  Bethea did emphasize, however, that if Folsom ever believed that any
of Mertz's actions were based on discrimination under a protected category, that he should meet
with Bethea again regarding his options (Jones Cert. Ex. 7).  Plaintiff, in a letter opposing his
termination, stated that he did not file any written complaints because he did not want to create a
"negative work environment" and that he would "just do [his] job."

[6]  There is no indication in the record that Folsom was "talked out of" filing a complaint
or that Bethea did not believe his claim was valid (in the ACLU letter, Plaintiff complains that
Bethea did not believe that his complaints were "valid.").

colleagues [sic] for fear of retaliation and ostracism." Folsom, in his deposition, testified that he e-mailed Rizzi to tell her "the situation that I was encountering at work on a daily basis" and that she told him he should file a complaint, but after meeting with Bethea, Plaintiff elected not to file a complaint. Folsom could not recall the substance of the e-mail to Rizzi nor could he recall what Rizzi said in response to his e-mail (aside from the general proposition that he file a complaint) (Jones Cert. Ex. 2 at 45:17-46:16).

II.

Plaintiff charges Defendant with discrimination based on race and hostile work environment pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.

*A. Pro Se Leniency*

The federal courts "have traditionally given pro se litigants greater leeway where they have not followed the technical rules of pleading and procedure." *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993). Plaintiff, as a pro se litigant, is entitled "to more leniency in certain matters than an experienced attorney would receive." *Thompson v. Target Stores*, 501 F. Supp. 2d 601, 603 (D. Del. 2007). However, "while courts liberally construe the pleadings and the complaints of pro se plaintiffs, pro se plaintiffs must follow the rules of procedure and the substantive law." *Id.* at 604 (internal citations omitted). Although, as noted in footnote 1 of Defendant's reply letter-brief, Plaintiff improperly submitted three opposition briefs in this case (the early pre-emptive opposition before the motion was even filed, a regular opposition brief, and a "supplemental" brief), the Court is lenient in considering these submissions and liberally construe them as all part of the same opposition to the motion for summary judgment. Furthermore, Plaintiff failed to submit a response to Defendant's Local Civil Rule 56.1 Statement of Material Facts; however, in his submissions,

8

Folsom has asserted his own version of the facts, including allegations of harassment and a variance in interpretation of the representations made to him by union and EEOC representatives. Thus, the facts adduced by Plaintiff that vary from Defendant's Rule 56.1 Statement are deemed as denials of Defendant's statement of facts; the balance of Defendant's factual assertions are supported by the submitted exhibits in the Jones Certification, and thus should be deemed uncontested. *See Longoria v. State of New Jersey*, 168 F. Supp. 2d 308, 312 n.1 (D.N.J. 2001).

However, Plaintiff, puzzlingly, filed what appears to be a second complaint listing new allegations, attached to his September 13, 2007 pre-emptive opposition brief. Plaintiff had not filed this document as the complaint in this matter – his complaint was a form Title VII civil rights complaint. Furthermore, Magistrate Judge Hedges, on February 21, 2007, denied Folsom's request to amend his complaint to add an ad damnum clause. There is no indication that Folsom – then, or later – requested to submit a new complaint or to amend his existing complaint to add new allegations. Thus, the Court does not consider this document as the complaint or an amendment thereto. Plaintiff, although pro se, knew the Federal Rules well enough to ask Magistrate Judge Hedges for permission to amend his complaint in February, 2007. If he wanted to add new allegations to his complaint he should have asked to amend again rather than surreptitiously attaching a new complaint to a pre-emptive responsive brief that he also filed without permission.

*B. Summary Judgment Standard*

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant,

and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement.  *Anderson*, 477 U.S. at 247-48.

*C.  Title VII:  Discrimination*

Discrimination claims brought under Title VII must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  The framework consists

10

of three steps. First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. Generally, to establish such a prima facie case, the plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered from an adverse employment decision; and (4) the employer sought to or did fill the position with a similarly qualified person who was not a member of the protected class. *McDonnell Douglas*, 411 U.S. at 802.[7]

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802.

If the defendant satisfies this burden, the reviewing court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff, who must come forward with admissible evidence showing that the defendants' articulated, nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253.

A plaintiff will satisfy this burden by providing evidence that would cause a fact finder to disbelieve the reasoning articulated by the defendants or believe that invidious discriminatory reasons were more likely than not a motiving cause of the defendants' actions. *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). Although the evidentiary burdens shift between the plaintiff and the defendants, the "ultimate burden of persuading the trier of fact that the defendant intentionally

---

[7]  When applying *McDonnell-Douglas*, the precise elements of the prima facie case vary based on the context of the case and were not intended as rigid or unbending. *Lynch v. Robertson*, 2007 U.S. Dist. LEXIS 60835, at *28-28 (W.D. Pa. Aug. 20, 2007) (citations omitted). The Third Circuit has indicated that the elements of the prima facie case are not universal and can be tailored to fit the specific context of the case. *Id.* at *28 (citations omitted).

discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

    *1. Prima Facie Case*

    To establish such a prima facie case of discriminatory discharge, the plaintiff must show that "(1) he is a member of a protected class; (2) he performed his job to his employer's satisfaction; (3) he was discharged; and (4) others outside of his protected class were treated more favorably." *Mitchell v. W. Union*, No. 06-949, 2007 U.S. Dist. LEXIS 92621, at *14 (D.N.J. Dec. 18, 2007).

    Plaintiff can easily prove prong (1) and prong (3).  As an African-American, Folsom clearly is a member of a protected class.  *Fairfax v. Sch. Dist.*, 2004 U.S. Dist. LEXIS 7750, at *11 (E.D. Pa. April 26, 2004).  Also, it is uncontested that Folsom was terminated.  Prong (4) is questionable, but given Plaintiff's pro se status, and given that on summary judgment all inferences are made in favor of the non-moving party, the Court could find that prong (4) is satisfied.  In his "supplemental" brief, Plaintiff indicates that Defendant "retained officers with comparable or lesser qualifications who were not in the protected class," specifying a 25-year-old Latin-American woman, a 40-year-old White woman, a 35-year-old Haitian-American woman, and a 33-year-old White male.  Making all inferences in Plaintiff's favor, the Court could conclude that Folsom was replaced by employees not in the protected class (African-American) or that these other employees were treated more favorably than Folsom (in that they were "retained" and presumably not terminated).[8]  Thus, there is no genuine issue of material fact as to prongs (1), (3), and (4), and they cut in Plaintiff's favor.

---

    [8] At oral argument, Defendant noted that later, an African American woman was hired for the same position as Folsom and was also ultimately terminated for similar performance-related reasons.  However, giving all inferences to the Plaintiff, this conclusory statement is not enough to cause his prima facie case to fail at prong (4).

At prong (2), however, the analysis is more complicated.   In the Third Circuit, prong (2) of the prima facie case involves showing that the Plaintiff in a Title VII racial discrimination action "was qualified for his position."   *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990).[9]   The *Weldon* court indicated that subjective factors such as poor performance evaluations were not properly considered at the prima facie case stage – indeed, "while objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the McDonnell Douglas analysis."   *Id.*   Therefore, "to deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext."   *Id.* at 798-99.   In *Weldon*, the court concluded that at prong (2), the proper consideration is the plaintiff's "background qualifications for the position at the time he was hired" and not "negative evaluations . . . couched largely in subjective terms," such as the plaintiff's "difficulty understanding and preparing the reports that were required of him . . . ."   *Id.* at 799.   The court declined to treat such subjective assessments "as evidence that [plaintiff] failed to establish a prima facie case, thereby collapsing the entire analysis into a single step at which all issues are resolved."   *Id.*   Instead, the court indicated that it would "consider the assessments in the context of [plaintiff's] charge that the poor evaluations he received were a pretext for racial discrimination and unworthy of credence."   *Id.*

---

[9]  There is at least one recent case in this district that utilizes the "satisfactory performance" test in a subjective manner; however, that case arose in the context of the New Jersey Law Against Discrimination, not Title VII.   *Mitchell v. W. Union*, No. 06-949, 2007 U.S. Dist. LEXIS 92621, at *16-17 (D.N.J. Dec. 18, 2007).

Here, while Defendant would like to incorporate Plaintiff's three "unsatisfactory" reviews at this point in the analysis to show that Folsom was not qualified for the position, the above-cited case law holds that factors such as performance evaluations are better evaluated at the pretext stage of the *McDonnell Douglas* test.  In proper consideration of prong (2), Folsom, in his "supplemental" memorandum, indicates that he was qualified for the position of probation officer because he has a Bachelor of Arts degree in Criminal Justice from Seton Hall University and because he has written research papers on topics in criminal justice.  Defendant does not contend that Plaintiff lacked the necessary education for the job or that he was not objectively carrying out the tasks assigned to him. Thus, considering Plaintiff's evidence and construing all inferences in his favor, the Court should find that prong (2) is satisfied.  Thus, Plaintiff has established a prima facie case of discrimination, and the *McDonnell-Douglas* analysis moves on to the second prong.

### 2.  Legitimate Non-Discriminatory Reason

The defendants' burden to show a non-discriminatory reason for its action is "relatively light." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994)).  There is an overwhelming amount of evidence in the record that Plaintiff's performance was below expectations and that he was fired because he failed to improve his writing skills and because of mistakes and delays regarding his reports.  Furthermore, Plaintiff even admits, in his deposition testimony, that he was fired because of his performance, and that he knew he had to improve his writing skills  (Jones Cert. Ex. 2, Folsom Dep at 51:11-16, 65:24 through 66:2). Finding defendants' showing sufficient, the burden then shifts back to the plaintiff to demonstrate pretext.

*3. Pretext*

If the defendant establishes a legitimate, non-discriminatory reason for its actions, the Plaintiff, to survive summary judgment, must then "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

As to the quantum of evidence required to survive summary judgment, the Plaintiff need not present "evidence directly contradicting defendant's proffered legitimate explanation" but the Plaintiff also cannot merely argue that "the factfinder need not believe the defendant's proffered legitimate explanation." *Id.* Rather, to avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* (internal citations omitted). The Plaintiff must show, however, more than that the employer was mistaken or wrong, as the factual dispute goes to discriminatory animus, not the wisdom of the employment action. *Id.* at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (internal citations omitted).

Here, Plaintiff has offered no evidence to discredit Defendant's proffered explanation of Plaintiff's poor work performance, nor has he offered any evidence such that a factfinder could find,

by a preponderance of the evidence, that Defendant's explanation was a post hoc fabrication to cover up actual discriminatory animus. Plaintiff offers no evidence of weaknesses, inconsistencies, or implausibilities in Defendant's reasoning. His opposition papers are riddled with conclusory allegations that he was terminated for racially motivated reasons apart from his poor performance review. On a motion for summary judgment, the non-moving party may not rest on "mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial." *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990);

Plaintiff offers no proof that Defendant fabricated its reason for terminating Plaintiff post hoc; indeed, the record shows quite the opposite – over the six months of his employment, Folsom's reviews steadily declined. The reviews took place throughout the entire course of Folsom's employment and indicated sub-par performance and failure to fulfill employer expectations. Plaintiff appears merely to disagree with the reviews and their ultimate outcome. Critically, however, Plaintiff's own claims and declarations with regard to his performance are unavailing with regard to pretext, *Bernhard v. Nexstar Broad. Group, Inc.*, 146 Fed. Appx. 582, 585 (3d Cir. 2005), and the Plaintiff's "view of his [own] performance is not at issue; what matters is the perception of the decision maker." *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991). "The fact that an employee disagrees with an employer's evaluation of him does not prove pretext." *Id.* Thus, Folsom's disagreement is insufficient, and he cannot otherwise show that Defendant's proffered reason for termination was made up post hoc to cover up actual discriminatory animus. Furthermore, Plaintiff shows no inconsistencies or implausibilities with regard to the reviews, as they did not

contradict themselves, and they were corroborated by multiple employees who all complained of the same shortcomings.[10]  Plaintiff even admitted, in his deposition, that he was "terminated as a result of [his] evaluations" and that he had "needed to improve [his] writing skills."  (Jones Cert. Ex. 2, Folsom Dep at 51:11-16, 65:24 through 66:2).

In his attempt to discredit Defendant's reasons, Plaintiff offers conclusory allegations of Mertz's inhumane treatment.  He claims he was verbally harassed and yelled at on a daily basis and singled out, he was mentally abused, criticized in front of co-workers, received negative comments in his personnel file, received inadequate mentoring, had his work product "sneered" at, and that his supervisors caused unwelcome stress that caused his poor performance.  Assuming these allegations are true (giving all reasonable inferences to Folsom), he still fails to prove that it is more likely than not that the reason for his discharge was racially motivated.

The only allegation Folsom makes that could even hint at racial animus would be his claim in that he "was the only African-American Male Probation Officer in the Division and it was shown that the co-workers did not want him to work there."  Assuming this is also true, this allegation alone is not enough such that a factfinder could *reasonably* disbelieve Defendant's proffered justification

---

[10]  The Court should note that "low evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria" and that the Court must carefully analyze decisions made based on subjective evaluations because of the high potential for abuse. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006).  However, after closely reviewing the four reviews that Folsom received during his tenure with Defendant, the Court is satisfied that the reports were legitimate, reasoned, corroborated by other employees, and gave Folsom more than a second chance at improvement.  "Barring discrimination, a company has the right to make business judgments on employee status, especially when the decision involves subjective factors deemed essential to certain positions." *Billet v. Cigna Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled on other grounds in St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

that Folsom was fired for poor performance.[11]  "When determining whether a plaintiff's claims should survive summary judgment, the record must be viewed as a whole, and evidence should not be considered in a vacuum."  *Anderson v. McIntosh Inn*, 295 F. Supp. 2d 412, 420 (D. Del. 2003).  Two recent cases in this circuit are instructive.

In *Bates v. MHM Corr. Servs.*, No. 05-2285, 2008 U.S. Dist. LEXIS 9944 (M.D. Pa. Feb. 11, 2008), an African-American female mental health specialist was providing services to prison inmates as an employee for a mental health provider contracted by a prison.  On her way to work, she was delayed at a locked door in the prison while a security guard surveyed her through a viewing slot in the door.  Plaintiff construed this delay as race-based scrutiny, and expressed this opinion to her class of prison inmates.  Plaintiff was eventually terminated.  The plaintiff in *Bates* asserted that the Department of Corrections ("DOC") had banned her from the prison based on racial discrimination,

---

[11]  At the Court's request, the Defendant submitted a supplemental certification regarding the racial composition of the Middlesex Vicinage and the Criminal Division thereof.  Bethea, Defendant's EEOAA Officer, submitted a certification and his "Workforce Analysis & Implementation Plan Status Report" dated June 30, 2006 ("Status Report") prepared pursuant to his responsibility to conduct statistical analyses of the work force to identify where minorities and women are underrepresented (Bethea Cert. ¶ 2).  Bethea's certification, citing the Status Report, notes that as of October 2005, 40.3% of individuals employed by the Middlesex Vicinage were minority (Bethea Cert. ¶ 4).  Bethea further noted that within the probation officer position, 56.8% were minorities, with 17.3% being African American (Bethea Cert. ¶¶ 6, 7).  In 2005, according to Bethea, 48 individuals were terminated, 14 (29.2%) of whom were Black; however, new minority hires surpassed the number of minorities fired, allowing the Defendant to maintain its minority representation (Bethea Cert. ¶ 9).

Plaintiff was given an opportunity to respond to Defendant's supplemental certification and Status Report.  Folsom's response, however, challenges Bethea's Status Report only in that Defendant allegedly took too long to hire African-American employees at CCMU and that the figures in the Status Report "have shown the issue of race apparent only in the context of [CCMU] and not Superior Court of NJ, Middlesex Vicinage exclusively" (Folsom Reply to Bethea Cert. p. 1).  The remainder of Folsom's response raises no new issues or challenges, and merely reiterates many of the arguments he has already made.  Thus, the Court is skeptical that Folsom was, indeed, the only African-American employee or probation officer at CCMU.

but the court found that there was insufficient evidence to support such a claim.  *Id.* at *24.  The DOC had argued that plaintiff lacked any direct evidence of discrimination; plaintiff offered, as direct evidence, that "she was the only black member of [defendant employer] and that 96.9% of [the employer's] employees were white and 1.5% were black."  *Id.* at *25 n.9.  The court, however, found that "[i]n a vacuum, these statistics do not indicate discrimination."  *Id.*  Plaintiff otherwise pointed to no evidence to prove that the employer's proffered  non-discriminatory explanation was pretextual, and the court granted summary judgment as to her Title VII claim.

Similarly, in *Hopkins v. Elizabeth Bd. of Educ.*, No. 03-5418, 2005 U.S. Dist. LEXIS 17031 (D.N.J. Aug. 4, 2005), an African-American Spanish teacher was terminated based on the expiration of his one-year contract, but claimed racial discrimination based on alleged victimizing policies and delays in processing his paperwork.  Plaintiff alleged that he was the only African-American male Spanish teacher at his school, but offered no other "specific allegations of discrimination" and thus his "claim [could not] be maintained" and summary judgment was granted.  *Id.* at *15.

Here, Plaintiff's claim, standing alone, that he was the only African-American probation officer, is not enough to create a genuine issue of material fact at the pretext stage.[12]  While Plaintiff also appears to offer a combination of other circumstantial evidence alongside his claim that he was the only African American (including alleged uncorroborated harassing behavior and "negative" treatment) he proffers no evidence, or even mention, of *race-based* harassment or discrimination. Nowhere in the record does he ever indicate – in his discussions with Bethea, Rizzi, or DiCaro – that he believed the alleged harassment and negative treatment was based on race.  In fact, he told Bethea

---

[12]  As noted above, the Court is wary of this claim given the statistics submitted in Defendant's supplemental certification of EEOAA Officer Bethea, and Folsom's failure to substantively rebut or contradict same.

that he believed Mertz's actions were "personal" in nature.  Thus, it appears that Folsom is trying to make an attenuated post hoc connection between his alleged negative work experience and the fact that he was the only African-American working in the office.  Although on a motion for summary judgment pursuant to *McDonnell Douglas*, the standard to create a genuine issue of material fact at the pretext stage is not burdensome, Folsom does not clear this hurdle.

For the above stated reasons, Defendant's motion for summary judgment as to Folsom's Title VII discrimination claim is granted.

### D.  Title VII:  Hostile Work Environment

In order to establish a hostile work environment claim, a plaintiff must show that the harassment was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).  The Supreme Court has made clear that Title VII is not a "general civility code," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and has also instructed:

> Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Hence, [a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotes and citations omitted).

Title VII "does not mandate a happy workplace," *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir.2006); rather, a hostile work environment claim requires discrimination based on a protected characteristic that is "severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990).  In order to establish a prima facie hostile work environment claim and survive a motion for summary judgment, Plaintiff must produce enough evidence to establish a triable issue of material fact such that a reasonable trier of fact could conclude that: "(1) she suffered intentional discrimination because of her [ethnicity, national original, religion, age, and/or sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.  *Jensen*, 435 F.3d at 449 (emphasis added).

The threshold issue in a Title VII hostile work environment claim is whether Folsom has "produced evidence of intentional discrimination based on" his race.  *Waite v. Blair, Inc.*, 937 F. Supp. 460, 468 (W.D. Pa. 1995).  "The mere fact that a work environment may prove to be intolerable to a particular employee does not necessarily implicate Title VII, since the civil rights laws do not guarantee a working environment free of stress."  *Id.*  Title VII does not guarantee workplace utopia, or even a pleasant workplace – if the working environment "is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated.  In short, personality conflicts between employees are not the business of the federal courts."  *Id.* (citations omitted).  The *Waite* court concluded that allegations of yelling, inconsiderate treatment, and co-workers not listening to or taking a plaintiff seriously were not enough for a prima facie case of hostile work environment under Title VII.  *Id.*  Furthermore, there

were several comments made to the plaintiff in that case – a Korean woman – that could arguably have been construed as racial slurs (which the court declined to so find), and the court still held that no hostile work environment existed because even the utterance of racial epithets does not necessarily rise to the level of a Title VII violation.  *Id.*  The court thus found that there was insufficient evidence to create a genuine issue of material fact as to whether plaintiff was subject to intentional discrimination based on race.

Here, the same is true.  Folsom offers substantially less evidence than did the plaintiff in *Waite*.  As noted above, Folsom offers a litany of allegedly hostile acts by his co-workers, but offers no evidence that any of the hostility he claims to have experienced was based on the fact that he is African American.  Folsom claims that he was subjected to daily verbal harassment and singling out, mental abuse, racial discrimination, criticism, negative comments, inadequate mentoring, "sneering," and unwelcome stress.  However, as noted above, even taking the alleged harassing acts as true, the only fact Folsom points to that could even remotely suggest that these actions were racially motivated was that he was the only African-American probation officer working for Defendant.  This observation is simply not enough for a factfinder to reasonably believe that whatever mistreatment Folsom was subjected to was based on race, and thus create a triable issue of fact.  Indeed, Folsom never, during his employment, complained to anyone about racial animus.  In fact, he did the opposite – he told Bethea his problems with Mertz were "personal" and he never told Rizzi or DiCaro any of the problems he was having.

There is simply no evidence to support Folsom's conclusory allegations of "racial discrimination"; in comparing this case to *Waite*, where there were racially charged statements present and the plaintiff still faltered at the first prong of the analysis, it is clear that Folsom similarly

cannot satisfy the threshold racial-motivation requirement.  The unfortunate fact that Folsom was exposed to an unpleasant working environment and was treated poorly by co-workers and supervisors is not enough to survive summary judgment as to his race-based hostile work environment claim.  *Faragher*, 524 U.S. at 788; *Breeden*, 532 U.S. at 270-71; *Jensen*, 435 F.3d at 451.  Thus, it is unnecessary for the Court to decide whether the workplace harassment was "severe and pervasive," what effect it had on Folsom, or whether Defendant is subject to respondeat superior liability.  Defendant's summary judgment motion is granted as to the hostile work environment claim.

III.

Defendant's motion for summary judgment is granted in whole, and this case is hereby dismissed.

*s/Peter G. Sheridan*       <br>
PETER G. SHERIDAN, U.S.D.J.

April 17, 2008